Good morning, your honors. May it please the court. Justin Sarno appearing on behalf of the appellant, Rocio Martín Leal. With the court's permission, I'd like to reserve one minute of time for rebuttal. Thank you very much. This court should reverse the district court's denial of qualified immunity because the law was not clearly established at the time Martín Leal acted. As this court is well aware, the plaintiff bears the burden of proving whether or not the allegedly violated right is clearly established. And here the plaintiff failed to meet their burden. Specifically, the cases cited by the plaintiff, as well as the district court in its order, are materially distinguishable. So much so that Martín Leal was not reasonably on notice that her conduct was unconstitutional. Before I briefly address those cases, I'd like to first address the 2025 decision in DeBronstein, which this court has requested the parties to address. DeBronstein is distinguishable and should not serve as the litmus test or the lodestone by which this court is decided. DeBronstein did not involve a jail setting. DeBronstein did not involve a suicide. DeBronstein involved a major roadside automotive collision for which the receipt of care was obvious. Now, it talks about how we look at whether the need for medical care is essentially fact or law and whether you need to have law about the medical assessment of fact. And so why would it be why would it be different? And you started with this isn't about suicide or jail. Why should it be different? What how we think about the problem? Because the obviousness of the physical manifestations of injury in that case, for example, the law enforcement official had difficulty differentiating between whether or not the individual is suffering from drug related issues or tragically, in actuality, a stroke. But the physical manifestations of injury were obvious. And yet the official did nothing. Why does obviousness matter? Because when we have and particularly in the jail setting, we have numerous people interacting with an arrestee. You have the arresting officer and then you've got a handoff to a jailer like we have in this case that we also had that situation in Cannes where it was an arresting officer handing off to a jailer. And so if someone is like witnessing something that's happening like suicidality, that's one thing. In this case, I mean, I think you I'm guessing you would agree. Martin Liao, she acknowledges that there is a known suicide risk here. She was told before she put the decedent in the cell. She was told while she was putting the decedent in the cell. She was told after she put the decedent in the cell. That's right. And I would point your honors, because there's a specific nuance that I think is particularly important here. And that's at page three, 17 of the record, where Officer Saldana tells Martine Liao that Tranberg Holdley was threatening suicide as a manipulation tactic to sleep with Mrs. Doe. And the problem is and with respect to the point of obviousness is we're foisting a burden on a detention officer to make extraordinarily complex determinations, psychological determinations for which there's a DSM five. I mean, this is no one thinks that she's a doctor. Correct. She has a bunch of forms that she's supposed to do. She has protocols to do. She has things that she admits exactly what she should have done. She doesn't seem to be she doesn't actually seem to be at all ambiguous about whether he was a suicide risk. So once we get to the point where she is not where she knows what additional information do we need to say that there is a suicide risk? Well, I think in this particular case, because the nuance is that, you know, it was being used as a manipulation tactic. I mean, all of that is occurring within the skull. Right. So the difference from DeBronstein, for example, is that you have clear physical signs of distress in the case of suicidal ideations. It's far less obvious. Is your argument. Does your argument rest entirely on pronged to have qualified immunity or to ask the same question another way? If we taking all the facts in the light, most favorable to the plaintiff, as we have to do at this stage, do you think that they establish a violation of a constitutional right? No, not at all. And this is a prong to case exclusively. Those are two different things. If taking all the facts in the light, most favorable to the plaintiff, if they don't establish a violation of a constitutional right, then you'd win a prong one. Right. If they do, but it's just not a clear constitutional right, then you'd win a prong to. So are you making just a prong to argument or also a prong one? We're making a prong to argument, Your Honor. OK, so you so then you you concede that taking all the facts in light, most favorable to the plaintiff, they establish a violation of the 14th Amendment, but just it wasn't sufficiently clearly established. That's correct, Your Honor. Yes. And what I'd like to do is point to Your Honor's reference to the con decision and the cases that were cited by the plaintiff in the district court, because in con, that was a particularly egregious circumstance in which the deputies were transporting the suspect in the back of the cruiser and the suspect starts wrapping a seat belt around her neck and starts to choke herself as if to commit suicide. But what they were what was clearly established in con, those those officers didn't get qualified immunity. Right. Right. And what they were supposed to have done is one of two things. Either get medical help, like take this person to the hospital instead of the jail, or at least tell the jailer that there's a suicide risk. I agree. No, no, I agree. And I think that's what Saldana told Merton Leal. But she didn't have to witness it herself. He told her and she is not ambiguous about whether she thought he was a suicide risk. I realize there's some negative facts and positive facts, but none of that in her estimation, as she admits later, adds up to her being ambiguous about suicide risk. I understand that, Your Honor. I fundamentally believe that that the issue of suicidal ideations is distinct in terms of its obviousness as pitted against the cases that were relied upon by the plaintiff con being one where I agree. Denial of qualified immunity under those circumstances was reasonable. The same as in Cloutier, where we had a circumstance where the mental health specialist affirmatively removed suicide protocol protections for the detainee and then gave him back his clothes, which facilitated his ability to commit suicide. And that was obvious. Would you agree that suicide is a medical risk? Yes, of course. And would you also agree that this case is not just about suicide? But I mean, everyone seems to be focused on suicide, but he's also withdrawing, which she also acknowledges. Would you acknowledge that withdrawing is also a medical situation? Yes, I agree. I mean, and for both of those medical situations. So he has clearly indicated at least two serious medical situation situations. But she it wasn't like some of some of the other cases where she kind of made the wrong choice. She actually did nothing medically. Well, what I what I would point to, Your Honor, then is the decision right? Because in 2019, this court found that a deputy who had been told about a threat of suicidality from the mother essentially allows the detainee to remain in the cell for 27 minutes. With respect to Horton, does it make a difference here that we have two medical conditions, not just one? So to the extent that suicide is sort of maybe its own branch of medical issue, here we have just a straight up medical issue on withdrawal. They're connected, but we do have two things in the chart as opposed to one being just suicide. I understand. I mean, I think that that certainly raises the complexity level of the factual circumstances. But what it also does, doesn't simplify it. Well, in a sense, no, because for purposes of Martine Liao, who's a detention officer who doesn't have the training and experience as is undisputed on the record to make these these critical, difficult discriminations about differences in suicidal ideations and whether or not this is an immediate and obvious medical risk. I mean, I think it foists on the detention officer, a burden that just is not clearly established under the law, not unless we're relying on cases that are overly generalized to define the proposition. Can I ask you to read a point in Horton to you? Horton, we said it is critical whether our case law or case law had at the time of the events in this case, sufficiently clarified when a detainee is imminent risk of suicide was substantial enough to require immediate attention. Why isn't the question of whether a risk is substantial, a risk of suicide is substantial enough to require immediate attention, a medical or psychological or correctional question rather than a legal question? Why does it make sense to think of that as something that you would go look to cases to figure out rather than something that you would look to psychological practice manuals? I understand the concern, but I think a good thing to sort of look at under this circumstance would be the courts holding in Gordon to versus the county of Orange, where the court sort of bifurcates the qualified immunity analysis vis-a-vis medical professionals and nurses versus law enforcement officials. I mean, I think that there's a clear differentiation between the duties that are attendant to a medical professional who is more trained to make these determinations versus a jail prison guard who clearly doesn't have the training and experience to do so. But to Braunstein, and this goes back to a point that I think was made earlier, that that involved a highway patrol officer, right? Not a medical professional. And as I understood the holding there, it was that this question of, you know, did the person's, you know, there was, you know, the observable physical characteristics of the person, suggest a need for some sort of medical intervention? And we said, you know, that's a factual medical question. That's not a question that you go look to case law to figure out. And so I'm not sure why this would be different because this is all, I mean, they're both law enforcement officers. So that doesn't seem like a ground of distinction. I don't think ultimately that if the court were to look at to Braunstein as a roadmap with which to decide this case, it's doing so while honoring the Supreme Court's directive that we look at cases that are sufficiently specific. I mean, I understand the tension into Braunstein and the fact that we're looking at medical conditions generally, the court says, for example, what's the difference between, for example, a heart attack or appendicitis and why should we make those complex differentiations of degree? But I think to echo Judge Lee's dissent into Braunstein, I mean, the issue there is whether there are clear signs of distress and that creates so much so of a problem in the circumstance between drug withdrawals versus a stroke, but it's even more highlighted in the extraordinarily more complex and non-obvious circumstance of suicidal ideation. So for us to agree with you, do we have to agree with the Braunstein dissent? Well, I, it was, it was... You're saying that Braunstein's wrong and that's how we should decide this? No, I don't, but I do think that the observation made by Judge Lee in that case was particularly apt, especially when looking at the difference between a medical-related emergency, such as the difference between a stroke and the difference between drug-related effects and that of suicidal ideations, which are just simply less obvious because they don't possess the same physical manifestations. We have cases, including to Braunstein, where, I mean, where really the problem with what the officer did was just not getting medical help at all, but even that officer did more than the officer here. And same is true in a case like Gordon, right, where going down the wrong path might be one thing, but doing nothing seems to be where the law actually is clearly established that you have to do something when you've got, when you're presented with a medical. This is maybe not, you don't have to necessarily screen every person medically, but when you are presented with serious medical conditions, of which here we have two, you've got to do something. That's where de Braunstein seems to be sort of relevant in that way, right? Well, I think the problem is, is that at the end of the day, regardless of de Braunstein, and we believe it's too high a level of generality to apply to these facts, we do have the fact that there's reasonable mistake of law in fact, which applies for purposes of qualified immunity. And I do think that there are other circumstances undisputed on this record, which bear on the question of Martine Leal's duties and responsibilities at the time. I'd like to just list a few of them. The first, undisputed, it was an extraordinarily busy jail at the time that Tranberg-Hodley was admitted. We know that there are COVID-19 protocols that prevent two inmates from being in a cell at the same time, but most importantly, module A, which was the- She was busy, but weren't there just four detainees there? Yes, but the interesting fact that I think the court should focus on is that module A was the one module in the Gardena jail that was specifically designed for suicidal detainees, and it was occupied. So the question becomes for Martine Leal, is she foisted with the responsibility of trying to determine who's more suicidal under the circumstances? When we have a case that indisputably, we have Mr. Tranberg-Hodley committing suicide in less than an hour. I mean, it's not as if Martine Leal is sitting there twiddling her thumbs. I mean, she has to make classification determinations in an extraordinarily difficult circumstance. She was doing a lot of things, and she was really busy, but she's not doing this thing, and she is maybe making a choice about one suicide versus another. I mean, that just seems to be like a very fact-intensive question that doesn't necessarily go to what's clearly established, when clearly established seems to be about a known risk of suicide, and she doesn't seem to be unclear on that. I see that my time has expired. I'd love to respond to that. Go ahead and respond to the question. I would just like to say that Horton is on the books. I mean, and Horton provides notice to the official that a deputy was granted qualified immunity, which rails against the cases that have been cited, such as DeBronstein. We know that's 2025. That couldn't have informed her, but we know that there are cases that have applied qualified immunity, especially also Jordan 2, which albeit was decided in July 2021, but the court says in that opinion there's no established law that provides the right to direct view safety checks, and so that also bears on the question of whether this is debatable, which we believe it is, not a circumstance of her being plainly incompetent. And just to follow up on that, I mean, the point about, you know, there's the one cell where you can observe people, and that's full, and the COVID issues all seem, I mean, those are all very good points for you, I think, but I guess those seem like reasons that there's no violation at all here, but you've conceded that at this stage of the case, we have to assume that there is, right? So I'm just having trouble figuring out how that fits into the argument that you're making. It fits into the case law that exists, and the fact that there's nothing on point, given these circumstances, given suicidal ideations, that places her on notice that her conduct was unconstitutional. I'll still give you a minute for rebuttal, but let's hear from the other side.  I think he used your time, so I'm not sure what to do about that. Do you want to give more time? We could give you two minutes. Two minutes now. May it please the court, my name is Catherine Huang. I represent the appellant, co-appellant, city of Gardena, and I'd like to actually spend one minute on argument, and I'll save two minutes, I believe. You're not going to get rebuttal, so use your time now. I don't get rebuttal? Okay. The cause of action remaining against the city of Gardena is plaintiff's wrongful death action, and its premise solely on vicarious liability, and the city's position is that, as Martin Leal is not liable for wrongful death, so the city cannot be liable for wrongful death, and the – as Martin Leal is also immune under 845.6, so the city is also immune from 845.6. I want to clarify the record, actually, because I don't have rebuttal, that plaintiff's brief states that Martin Leal was terminated. She actually was not terminated. She actually ended up resigning, and I also wanted to clarify the record also indicates that Saldana asked Brandon Transberg-Hodley whether or not he was suicidal, and he said no. So I think that's a really strong point of distinction as to the reasonableness as to Martin Leal's actions. And briefly regarding the jurisdictional point, I think Horton is on point with respect to the jurisdiction of this court as to the 845.6 claim, and – Are you familiar with Hampton v. California, which I think suggests that the Government Claims Act does not provide immunity, so there's not immediate appealability? I do – I'm not familiar with that, I apologize, but I would just point to the fact that the facts are inextricably intertwined with the qualified immunity claim, and therefore the court can consider it. I think that Horton should apply as well as Jett, which they didn't address jurisdiction – in denying jurisdiction. They actually – in Horton, they went ahead and addressed the 845.6 claim, and also in Jett, I believe they also addressed 845.6 claim. And let's see. And I think any argument that the plaintiff ends up making with respect to the violation of policies, I believe that there was no imminent signs of suicide, especially consider Brandon said that day to Saldana, I am not going to harm myself, I'm not suicidal. And I think I'm over time, so I apologize. Thank you. Thank you. Good morning, Your Honors. John Burton for the appellees and the plaintiffs, the parents of this young man. And with me at council table is Arnaldo Casillas. I think the case should be affirmed. The order by Judge Slaughter was extraordinarily thorough. There were three hearings. There were 30 docket entries worth of evidence. A number of the claims were dismissed voluntarily. Going into that, there were summary judgment. The ones that remained clearly are tribal issues of fact. Under Rule 56, the summary judgment should be denied. Can you just articulate or obviously hung up on what the clearly established rule is? And I think it would be helpful for you to just articulate what you think that rule is here and the cases that it's based on. Well, we think two cases are extremely clear. The first is actually a Monell decision, Gibson versus County of Washoe, where the court said a meaningful screening to initiate the appropriate medical protocol is guaranteed for pretrial detainees under the 14th Amendment. Is that all detainees, which seems very general, or is it any detainee who presents a serious or possible medical condition? Oh, no, no. It's all detainees because without the screening, it cannot be determined whether the detainee presents a serious medical issue. So in that framing, suicide and withdrawal are just on the list of things that you would catch in a screening that everyone should have. Absolutely. Withdrawal can kill people by itself. Withdrawal is also a risk factor for jail suicide. Jail suicide is a well-known phenomenon. Go into any jail, there's signs saying, call the helpline. Guards carry X-Acto knives to cut down ligatures. There's suicide cells. Sorry, can I just ask you to clarify? I know that the defendant did not fill out the screening form and admits that, but I had not understood that to be the focus of your claim. I thought your claim was really sort of aside from that. She knew enough to do more regardless of the screening. Am I misunderstanding what your claim is? Yes, because it's both. It's clearly both. And the way that Judge Slaughter explained it, he said, there are two lines of cases that lead to this result. The first is the Waschau line of cases, which says you have to do a screening to determine if there's a medically appropriate procedure to implement. It has to be done. The classification, then it's- And how is that, to the extent that that's the proposition of law that you're saying was clearly established, how is it consistent with the Supreme Court's decision in Taylor? Because Taylor, which was distinguished by Judge Slaughter, and it's been distinguished by numerous district court judges, is a case where the only defendants in that case were the warden and the commissioner of the prison system. The actual care was being rendered by a contractor who was not before the court. So the qualified immunity was given to the warden and the director for allegedly not having adequate policies. Here, we're saying the policies were great. They just were not followed. Can you talk about- And everybody who's passed on this has said that Clothier survives the Burks case. Your friend on the other side is arguing that Horton controls this case and that Horton says that in a suicide case, you have to have, I don't want to say a DNA match, but a really close match in terms of the case law of a factually similar or maybe even identical case. So can you just say to us why Horton doesn't doom this case, and particularly how Horton is different, because maybe in that case, there wasn't another medical issue? Well, number one, there was no other medical issue. I mean, withdrawal alone was a reason to go to either the emergency room or the county jail. I mean, there were options. And if there wasn't a cell to put him in that was susceptible to observation, which was required under policy, there could have been a call to a supervisor, you know, what do I do? But to get back to Horton, in Horton, the prisoner was admitted. He was put in a cell. The mother called and spoke to the arresting officer afterwards, gave some information that could suggest a possibility of suicide, allegedly, and the officer did not go right away and check. That's a different fact. And here in Clothier, when someone is received and is a known suicide risk, and certainly Judge Friedland, we're not backing down on that one at all. I mean, setting the screening aside, I just did that chronologically first. The fact that he came in and they said he tried to hang himself this morning, we were told by his girlfriend, and there's a history of suicide, that that alone required a different form of housing and supervision than he received. On that particular point, are you arguing that it's not important that Martin Leal witness herself some kind of obvious sign of suicidal ideation, that that's just not important here because once she's told, she's told? Well, certainly once she's told, that's adequate. And in fact, anybody who's sort of done deep dives in this area knows that people who are intent on committing suicide tell people that they're fine and they're not going to do it because otherwise it will interfere with their plan. And his denying suicidality was just not the only piece of information she had because she has an officer walking down the hallway with her and back saying, suicide, suicide, suicide. Right. In fact, that officer had been told that he had attempted to hang himself that morning. So suicide, suicide. Plus she knew firsthand, and we have this on video, that he was saying, I'm withdrawing. I'm really depressed. I'm withdrawing from methadone. That independently required a different course of conduct than what she took. So in some ways, your answer on Horton is this isn't Horton because this is suicide plus another condition that would be equally serious meriting screening. Absolutely. But also, I don't think that Horton overruled Clothier or Khan. In fact, embraced both those holdings. So do you think that Horton is basically saying, yes, Khan and Clothier are this clearly established rule and we're just not there in this situation based on these facts? The way I think of it and the way I think that it plays with the DeBronstein question is that there are gray areas, but DeBronstein was not a gray area. Here's a guy who was in an accident who's showing these neurological symptoms. You have to get medical care. This case is not a gray area. Here's a guy who's withdrawing, who's tried to hang himself that morning, who's clearly not an appropriate inmate for this jail, needs to be held under observation until he can be taken to an appropriate facility. So at that point, so Martin Leal, knowing the information that she has, she can't put him in the one cell that you put people in in this circumstances full. So she thinks, I'll go put him in the other cell and check in on him sometime later. I mean, suppose at that point, she calls up the city attorney and says, here's what I know, here's my plan. Is that okay? And the city attorney at that point, I guess your positions would have said like, no, that's clearly a 14th amendment violation because why exactly? I don't think she should call the city attorney. I think she should call her supervisor. So the hypothetical is to illustrate whether there's clearly established law here. Judge Miller, you're raising a good question, but the person she should call in this situation is her supervisor. Hey, I've got somebody who's suicidal, who's withdrawing, and I don't have a cell. What do you want me to do? So it was maybe an inert question. That's right. What is the rule of law and what are the cases that at that point would have told her that her proposed course of action was improper? The case that told her that the action was improper is Clothier saying, you cannot take somebody who is a known suicide risk and maybe has other conditions and put them in a remote cell and not look at them when you would close. When the close by cell from which you can observe them is full? There's alternatives. The alternative is to first call the supervisor and say, what should I do? The second is take him to the emergency room, which they call an okay to book. The third is a county run. These kind of patients... Clothier tells you you have to do that? Clothier says you have to put him in an appropriate place, not an inappropriate place. The module L, which is the furthest cell from the booking area, is not an appropriate place to put somebody who is suicidal and withdrawing. That's the only cell that you have. What is it in Clothier that says you have to go outside of the facility that you're in charge of? Because Clothier says you cannot be deliberately indifferent to a threat of suicide by putting somebody in an environment where they can kill themselves when you know that that's a risk. Cannot disregard that risk under the 14th Amendment, which is what she did. They say, we don't want a jailer making sophisticated medical judgments, whether this is a manipulation tactic or whatever. Well, that's absolutely right. We don't. She's the one who did by saying, oh, well, he's not really suicidal. We can put him in the cell and check him an hour later and not keep him on a 15 minute watch in a cell that's nearby. I think it goes back to Kahn, which is the choice in Kahn was either don't take him to the hospital, not the jail, or take him to the jail for medical attention. But just taking to the jail without medical attention is wrong. That's absolutely correct. In that sense, Kahn is on all fours, although we didn't cite Kahn because it was the arresting officers. But I think that's absolutely right. Just going back to your argument about gray areas, you mentioned that DeBronstein is not a gray area and you think this case is not a gray area. And so basically, are you saying that you think that Horton is a gray area? That's why they said, no, we just don't have something really that fits this situation because it just doesn't add up? Horton is a gray area. I think the underlying principles are, well, whether those obligations are triggered by once a person's in custody, a telephone call from the mother that then the arresting officer has to immediately check the cell, that is not settled. And what about methodologically, Horton? I mean, methodologically, Horton may just kind of leave us with this problem, which is that kind of a mistaken apprehension of the whole situation is a good enough reason to say no clearly established law. So how do you address that? I don't think that's what Horton says. I think that's what Bronstein says, which is if there's a mistake, the mistake has to be reasonable. And the jury decides whether the mistake is reasonable. On prong one. On prong one and prong two, I think it's a jurisdictional question. I mean, the plaintiffs believe this court should not decide the merits of prong two. I'd like to follow up and try to understand how you're reading Horton. So Horton's discussion of this ends that the case law at the time of Horton's attempted suicide was simply too sparse and involved circumstances too distinct from those in this case to establish the reasonable officer would perceive a substantial risk that Horton would be would imminently attempt suicide. So it's like looking to the cases to see what the officer should have known. But I think you're trying to say it's not about the cases. It's about whether just factually it was obvious that the is no case holding that an officer who is told somebody already in custody is a suicide risk. And then the officer has to immediately check that person. They say, well, that's not clear enough in our cases. So we're going to give him qualified immunity. What Clothier and Kahn are saying is that when somebody is brought to a facility and has indicia of suicidality at that time, those cannot be disregarded and have him just put in a remote cell and unmonitored contrary to the jail policy. And that if there's a question, well, I made a reasonable mistake on whether he was suicidal, that's an issue of fact. And we don't look to case law to sort of define whether somebody who says, I don't really want to kill myself. I just want to sleep with my girlfriend or something. We don't go into those nuances. Those are our factual nuances, which is why not only is this case not disposable on summary judgment in the defendant's favor, but we don't think that the court should even be hearing it on the merits, that we think that the approach in Alexander and Peck should be utilized in this case. Okay. You're over your time now. So I think I need to cut you off. Thank you for the helpful arguments. I think we had a minute for rebuttal. Thank you. Your honors. Thank you. Page 597 of Horton. Mr. Horton's mother is speaking to Deputy Bryce and discusses his drug use, PCP and Molly. So we have suicidality plus. Also in Taylor, a 2015 decision from the U.S. Supreme Court, they state at page 826, no cases have discussed suicide prevention protocols. That's critical for determining whether the law was clearly established. Lastly, Alexander versus Nguyen, 2023. This court states with respect to cases involving the conditions of confinement and adequacy of medical care that the law was still developing in 2023. If that was the case in 2023, it was certainly the case in 2021. This court is respectfully requested to reverse. Thank you. Thank you both sides for the helpful arguments. This case is submitted and we're adjourned. Thank you.
judges: FRIEDLAND, MILLER, Traum